J-S38013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.A.S., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.S., JR., FATHER | : : : : : : : : | |
| | : | No. 2015 EDA 2025 |

Appeal from the Decree Entered July 1, 2025
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2024-A0026

BEFORE:  McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:            **FILED JANUARY 8, 2026**

G.S., Jr. ("Father") appeals from the decree terminating his parental rights to R.A.S. ("Child"). Father argues the evidence supporting termination was insufficient. We affirm.

Child was born in 2010 and is the biological child of Father and D.S.L. ("Mother"). On March 1, 2024, Mother and Child's step-father, S.L. ("Step-Father") (collectively, "Petitioners") filed a petition for the involuntary termination of Father's parental rights.[1] The petition alleged Father had not had contact with Child since August 2023.

The court held two days of hearings, in May and June 2024. In January 2025, the court dismissed the petition without prejudice. It found Petitioners had failed to establish that they provided notice to Father and Child of the

_____

[1] Step-Father filed the petition, and Mother joined it.

option of a voluntary post-adoption contact agreement. ***See*** 23 Pa.C.S.A. §
2733(c).

Petitioners filed an amended termination petition on January 27, 2025.[2]
The court held a third termination hearing in April 2025. It summarized the
facts of the case as follows.

> [Mother] and [Father] separated in early 2011 when [Child] was
> only approximately one year old. [Father] thereafter moved to
> Texas, while [Child] and [Mother] lived in Maryland, and [Father]
> had only occasional contact with [Child] approximately twice per
> year from the time she was one year old until she was about seven
> years old. [Mother] testified that the last such visit[,] voluntarily
> agreed to by both of the birth parents[,] occurred in August of
> 2017. [Father] did not dispute this testimony, nor did he dispute
> that he had no visits and requested no visits with [Child] from
> 2017 until 2020. [Mother] stated that she had no contact from
> [Father] and no requests for visits with the child during this period
> from August of 2017 until 2020.
>
> Then in 2020, when the child was ten years old, [Father]
> filed a petition for modification of custody in the Court [of]
> Common Pleas of Montgomery County. This commenced a series
> of attempts at reunification and visits from 2021 through 2023.
> From 2021 through August of 2023, the parties were engaged in
> periods of court-ordered family reunification therapy in 2021,
> (which occurred virtually due to the COVID-19 Pandemic),
> followed by an agreed custody order in July of 2021, which
> contemplated with shorter visits in Pennsylvania, overnight visits
> in Pennsylvania and eventually overnight visits every other
> weekend in Maryland. For about a year, between 2021 and 2022,
> the parties complied with the terms of the agreed custody order.
> [Mother] filed a petition to modify the custody order in November
> of 2022. In June of 2023, the Court of Common Pleas of
> Montgomery County, Family Division, issued a new Order that
> required family therapy sessions, and required that the parties

_____

[2] The court appointed counsel for Father. After finding there was no conflict
between Child's best and legal interests, the court appointed an attorney to
serve as both counsel and guardian *ad litem* for Child.

would comply with the recommendations of the therapist. In July and August of 2023, [Father] and [Child] participated in six virtual therapy sessions with a therapist, Kenya Easterling. The last of these virtual therapy sessions occurred in late August of 2023. These were scheduled as virtual sessions so that [Father] could participate from Maryland.

[Mother] testified that on or about August 23, 2023, the parties had a final session at attempted family therapy with the therapist, Ms. Easterling, and that at that session [Father] stated, in essence, "if you tell me that I'm a good dad and I've tried, I will just be done." [Mother], [Child], and the therapist, [Ms.] Kenya Easterling, interpreted this statement as an expression by [Father], that it was his intention to stop seeking visits with [Child].

After this last August 2023 therapy session in which [Father] and [Child] both participated virtually, [Father] did not send any mail or email to [Child], did not send any cards, including any Christmas card, did not send any gifts to [Child], did not make any phone calls seeking to speak with [Child], did not request any visit with [Child] in Pennsylvania. He also did not make any requests for information about her school enrollment or programs. In short, birth father made no attempt to contact Child at all from end of August 2023, until the initial petition was filed on March 1, 2024. Birth mother acknowledged that in 2024, on March 3, 2024, [Father] had sent a text message to [Child] to wish her a happy birthday. That was the only contact made by [Father], to [Child] from August 23, 2023, through June 13, 2024.

[Mother] testified that, after the last family therapy appointment attended by herself, [Child] and [Father], in late August of 2023, she and [Father] had exchanged emails. The therapist, Ms. Easterling, had recommended against an overnight visit for [Child] in Maryland. Therefore, [Mother] expressed to [Father] that he was welcome to come to Pennsylvania for a visit on the upcoming weekend. According to [Mother's] testimony and exhibit P-4, [Father] did not reply.

Since the family therapy ceased in August of 2023, and including the six month period immediately preceding the filing of the [a]mended petition for termination of parental rights, [Father] did not make any filing in the family division custody case seeking to modify or enforce the custody order.

In summary, [Mother] testified that [Father] has not seen [Child] in nearly two years, as his last in person contact with her was a lunch in the summer of 2023. His last virtual contact with her was a therapy session in August of 2023. Even more significantly, [Father] has not sent any cards or gifts for Christmas or for the birthday of [Child], or for any other purpose or at any other time, and has not proposed or requested any visits in Pennsylvania . . . with [Child].

[Father] testified that he sent occasional text messages to [Child] and [Mother] from June 2024 to March 2025, but did not send gifts and did not have any visits with her. He acknowledged that since August of 2023, he has had no other contact with [Child] other than a small number of text messages. He acknowledged that since the summer of 2023, he has not been to Pennsylvania except to attend court hearings before this Court. He also acknowledged that he did not file any motions or seek a conference or clarification of the custody order at any time after August of 2023. He stated that the reason he has not filed any motion to modify the custody order or to enforce his right to visits was that he could not afford an attorney to represent him in the custody matter at this time and he anticipated that the custody matter would be litigious.

The Court heard from [Child], privately in the presence of her counsel, after counsel advised that [Child] wished to be heard. Being fifteen years old[, Child] requested to be heard by the Court. All counsel agreed that she could be heard and that a transcript would be made of her testimony and that she would not be subject to cross examination by counsel, and that the Court could rely upon the transcript of her testimony as well. Upon interview by her counsel, [Child] testified that during the years when she had visits with [Father], she experienced extreme anxiety, particularly when visiting him at his home in Maryland which required her to be away from her home. She described symptoms of crying a lot and feeling that she was unable to get out of bed and that she was "walking through tar." She also described that since those overnight visits to her father's home in Maryland had ceased, her mental health and well-being had improved. This Court made clear to all parties, including to [Child] that the decision whether to terminate the parental rights of the birth father, [Father], was not [Child]'s decision to make nor [Child]'s responsibility. The responsibility for this decision rests entirely with the Court and is not a decision to be made by [Child] herself. Nevertheless, [Child's] testimony corroborates the testimony of [Mother] and

the therapist, [Ms.] Easterling, that [Child] was experiencing severe symptoms of anxiety which appears to have been exacerbated by overnight visits to see [Father] in Maryland.

Trial Court Opinion, filed Sept. 8, 2025, at 6-10 (citations to N.T. omitted).

The court found Petitioners established grounds for termination existed under 23 Pa.C.S.A. § 2511(a)(1), and that termination would best serve Child's needs and welfare under § 2511(b). The court entered a decree terminating Father's parental rights.

Father appealed. He raises two issues:

1. Whether there was sufficient evidence to support the findings of the Trial Court that Petitioners proved by clear and convincing evidence the requirements of 23 Pa.C.S.A. § 2511(a)(1) for the involuntary termination of Appellant Birth Father's parental rights.

2. Whether there was sufficient evidence for the Trial Court to conduct an analysis under 23 Pa.C.S.A. § 2511(b) and to support the findings of the Trial Court that Petitioners proved by clear and convincing evidence the requirements of 23 Pa.C.S.A. § 2511(b) that the developmental, physical and emotional needs and welfare of the minor child would be best served by the termination of Appellant Birth Father's parental rights.

Father's Br. at 7 (trial court answers omitted). Petitioners have filed an appellees' brief, and Child has filed a participant's brief requesting we affirm.

Father first argues there was insufficient evidence that termination was warranted under Section 2511(a)(1). He claims he did not refuse or fail to perform parental duties. Rather, in his view, he was unable to perform parental duties due to the contentious custody case, throughout which he "continuously attempted to maintain contact and exercise custodial time with [C]hild." *Id.* at 16.

Father points out that between 2011 and 2017, he maintained "consistent visits and Skype contact despite living in Texas[.]" *Id.* He asserts that in 2020, he filed a petition to modify custody but was initially prevented from visiting Child due to the coronavirus pandemic. *Id.* Father claims that thereafter, he exercised custody of Child, "including many activities and vacations." *Id.* at 17. He asserts that in 2022, after Mother filed a petition to modify custody, Child stopped wanting to visit him. *Id.* at 18.

Father also maintains that a miscommunication or misunderstanding prevented him from seeing Child after his final visit with her in 2023. He contends that the custody order stated that he was to comply with the recommendations of the reunification therapist, Kenya Easterling. He asserts that when Easterling recommended that he not exercise overnight custodial time in Maryland, he believed that this meant he could not exercise any custody of Child. He did not understand that he could or should have requested visits with Child in Pennsylvania, and did not believe that any such request would be granted. He contends that Easterling also recommended that Father not videochat with Child, and so he stopped requesting virtual visits as well. *Id.* at 18-19.

Father contends he could not afford counsel for the custody case, and the parties' inability to amicably communicate hampered his ability to visit with and contact Child. *Id.* at 18. Father asserts that in the months preceding the filing of both the initial and amended termination petitions, he "was attempting to remain in contact with [C]hild, either directly or via contact with

[M]other." *Id.* at 16. Father claims that since June 2024, he has tried to contact Child twice a month, but has not received any replies. *Id.* at 18. He asserts that Mother admitted that he texted her in 2024 and 2025, requesting visitation with Child, and that she never responded. *Id.* at 19-20.

Our standard of review is well settled:

> A party seeking termination of parental rights bears the burden of establishing grounds for termination "by clear and convincing evidence." *In re Z.S.W.*, 946 A.2d 726, 728 (Pa.Super. 2008). Clear and convincing evidence is evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Id.* at 728-729 (internal quotation marks and citation omitted). We accept the findings of fact and credibility determinations of the trial court if the record supports them. *See In re C.M.C.*, 140 A.3d 699, 704 (Pa.Super. 2016). If the factual findings have support in the record, we then determine if the trial court committed an error of law or abuse of discretion. *Id.*

*In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018).

Section 2511 of the Adoption Act provides that the court may grant involuntary termination of parental rights when grounds exist under any subsection of Section 2511(a) and termination will best serve "the developmental, physical and emotional needs and welfare of the child" under Section 2511(b). *See* 23 Pa.C.S.A. § 2511(a), (b); *Int. of N.A.S.*, 338 A.3d 191, 197 (Pa.Super. 2025).

Instantly, the court found grounds for termination under Section 2511(a)(1). That provision requires clear and convincing evidence that "[t]he parent by conduct continuing for a period of at least six months immediately

preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1). The court did not find that Father evinced a settled purpose of relinquishing his parental claim to Child, but that he had failed to perform parental duties. We have explained parental duties as follows.

> Parental duty is best understood in relation to the needs of the child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty, which requires affirmative performance. . . . [P]arental duty requires that a parent exert himself to take and maintain a place of importance in the child's life. . . . A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles . . . . Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the Child's] physical and emotional needs.

*Int. of N.A.S.*, 338 A.3d at 198 (citation omitted).

If the court finds a parent has failed to affirmatively perform parental duties for the six months preceding the filing of the petition, the court must consider (1) the parent's explanation, (2) the parent's post-abandonment contact with the child, and (3) the effect termination would have on the child, pursuant to the analysis required by Section 2511(b). *Id.* The parent facing termination bears the burden to prove any post-abandonment contact with the child has been "steady and consistent over a period of time," has

contributed "to the psychological health of the child," and has "demonstrate[d] a serious intent on the part of the parent to undertake the parental role." ***Id.***

Here, the court found that during the six months preceding the filing of the petition, Father failed to perform parental duties. It particularly cited his failure to meet "child's needs for support, understanding, love, affection and [his failure to seek] opportunities to develop and maintain a place of importance in her life." Trial Ct. Op. at 10. The court observed that Child has not lived with Father since she was approximately one year old. It also pointed out that she had only occasional visits with Father until she was around seven years old, and then had no visits with Father until 2020, when she was approximately 10 years old and the custody litigation began. The court found this lack of contact between Father and Child early in Child's life contributed to the difficulty of establishing their relationship. ***Id.*** at 11. Thereafter, Father's exercise of overnight custody "contributed to symptoms of severe anxiety that [Child] suffers from," and the ensuing virtual therapy sessions were unable to progress the parent-child relationship. ***Id.*** at 13. The court found that since Father stopped visiting Child in 2023, he has had no meaningful contact with her aside from a handful of text messages. ***Id.*** at 10. The court explained that Father "has delivered no gifts or cards and has not filed a motion with the family division to modify or clarify the custody order and his ability to have visits for this same two-year period." ***Id.***; ***see also id.*** at 11-12.

The court also considered Father's explanations for his failure to maintain contact with Child, and found them inadequate. *See id.* at 12. The court noted Father claimed he did not seek to modify the custody order because he was saving money to hire an attorney, and that he did not send any gifts to Child because he wanted to give her one in person, rather than send a gift that might be thrown away. *Id.* at 12-13. The court also noted Father had made multiple requests for visits in Maryland, despite the therapist's recommendations against such visits. *Id.* at 13. However, the court also found Father "never suggested that he would be willing to come to Pennsylvania for a visit and did not reply [when Mother] suggested this[.]" Instead, he "effectively stopped requesting visits or inquiring into the well-being of [Child] for a period of nearly two years." *Id.* The court concluded,

> [B]y failing to seek alternative options for visits to occur in Pennsylvania, by failing to send his gifts or gift cards to [Child] at her home, and by failing to exert himself to understand and appreciate her severe anxiety and seek ways to support her and express affection, other than through text messages, [Father] has not "demonstrated a serious intent . . . to re-cultivate a parent-child relationship."

*Id.* at 14 (quoting *In re Z.P.*, 994 A.2d 1108, 1119 (Pa.Super. 2010)).

The court did not abuse its discretion in concluding Petitioners presented clear and convincing evidence that termination of Father's parental rights was warranted under Section 2511(a)(1). The evidence demonstrates that Father has failed to perform parental duties for longer than just the six months preceding the filing of the petition. Moreover, Father failed to "utilize all available resources to preserve the parental relationship," and "exercise

- 10 -

reasonable firmness in resisting" the obstacles, real or perceived, to maintaining a relationship with Child. ***Int. of N.A.S.***, 338 A.3d at 198 (citation omitted).

Father's second issue is whether Petitioners proved by clear and convincing evidence that termination would best serve Child's developmental, physical and emotional needs. However, in his argument, Father only asserts the court erred in conducting a best-interests analysis under Section 2511(b), since, in Father's view, there were no grounds for termination under Section 2511(a)(1). He has therefore waived any argument that the termination does not serve Child's best interests under Section 2511(b).[3] Furthermore, as we affirm the court's conclusion that there was clear and convincing evidence supporting termination under Section 2511(a)(1), Father's argument is without merit.

Decree affirmed.

_____

[3] Although Father does not argue termination of his parental rights is not in Child's best interests, we note that the court found that Petitioners presented clear and convincing evidence that termination would best serve Child's needs and welfare "so that [Child] may be adopted by her step-father and find permanence and security." Trial Ct. Op. at 15. We perceive no abuse of discretion in this conclusion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>1/8/2026</u>